**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello**

Civil Action No. 19-cv-02238-CMA-STV

AGRI-SYSTEMS, a Montana corporation, *d/b/a* ASI Industrial,

Plaintiff,

v.

STRUCTURAL TECHNOLOGIES, LLC, a Maryland limited liability company,

Defendant.

---

**ORDER DENYING DEFENDANT'S "MOTIONS *IN LIMINE*"**

---

This matter is before the Court on three motions to exclude expert testimony filed by Defendant/Counter Claimant Structural Technologies, LLC ("Structural"): (1) "Structural Technologies, LLC's Motion *in Limine* to Disqualify Matthew Hamlin from or Precluding him from Testifying as an Expert Witness" (Doc. # 92); (2) "Structural Technologies, LLC's Motion *in Limine* to Exclude Expert Testimony from Steven Bjordahl" (Doc. # 93); and (3) "Structural Technologies, LLC's Motion *in Limine* to Exclude Expert Testimony from Matthew Blackmer or to Disqualify Matthew Blackmer as an Expert Witness" (Doc. # 94). For the following reasons, the Motions are denied.

## I.    **BACKGROUND**

This is a construction contract case. The case centers around the design and construction of a silo facility in Eaton, Colorado ("the Project"). Plaintiff/Counter Defendant Agri-Systems, d/b/a ASI Industrial ("ASI") contracted to build the silos using a

slipform concrete construction method where concrete is poured in a single continuous pour as the form/mold moves vertically upward. (Doc. # 31 at ¶¶ 7–8.) The strength of the silos comes from reinforcing steel imbedded in the concrete during construction. (*Id.* at ¶ 9; Doc. # 91 at 8–9.) ASI subcontracted with Structural to provide "unbonded post-tensioning tendons . . . and anchors" as well as related placement drawings, supervision, labor, and equipment. (Doc. # 120 at 2.)[1] This post-tensioning work was to begin at an elevation of 140 feet (40 feet above the foundation) in the silos. (*Id.*)

Post-tensioning reinforcing steel must be accessible after the concrete is cured so that it can be stressed. (Doc. # 120-1 at 411); *see also* (Doc. # 91 at 9.) To do this in the instant Project, bulkheads with predefined hole configurations were to be fed into the slipform at designated heights. (Doc. # 120-1 at 411.) These bulkheads were designed to remain at their designated elevations in the face of the concrete as the slipform continued to rise vertically. (*Id.*) *see also* (Doc. # 91 at 8–9.)

During construction, issues arose with the first row of bulkheads to which Structural was to install the ends of the post-tension tendons, resulting in the bulkheads ending up several feet above the elevation where they should have started. (Doc. # 120 at 26–27, 46, 49–51, 303); *see also* (Doc. # 91 at 9; Doc. # 97-23 at 1; Doc. #97-31 at 2.) Structural argues that these issues resulted in additional complications—creating a type of domino effect—as the slipform continued to rise vertically, resulting in its inability to complete its work as outlined by the subcontract. (Doc. # 91 at 9–13; Doc. # 120 at

---

[1] Where both parties provided the same materials in their appendices, the Court has cited to one appendix.

36–38; 49–50); *see also* (Doc. # 93 at 2.) ASI, however, counters that "the effect of the bulk heads [sic] moving is limited to elevations less than 5' above the start of the post tensioning system[, and if Structural] had installed strands in the bulkheads . . . little to no repairs to the silos would have been necessary. (Doc. # 120 at 148.) In other words, this case revolves around determining who was at fault for construction deviating from the plans and which party is responsible for repairs. (Doc. # 2; Doc. # 31 at ¶¶ 21–54); *see also* (Doc. # 93 at 2); (Doc. # 100 at 14.)

ASI filed this lawsuit in Colorado state court on July 11, 2019 (Doc. # 1-1), and on August 7, 2019, Structural removed the case to Federal Court (Doc. # 1). ASI's Amended Complaint asserts four claims for relief: (1) breach of contract, (2) breach of warranty, (3) professional negligence, and (4) negligent misrepresentation. (Doc. # 31 at ¶¶ 28–54.) On August 7, 2019, Structural also asserted one counterclaim for breach of contract against ASI. (Doc. # 2 at 8–13.)

Both sides retained a number of experts. On November 23, 2022, Structural filed the instant Motions seeking to disqualify ASI's disclosed experts Steven Bjordahl, Matthew Hamlin, and Matthew Blackmer and/or exclude their testimony pursuant to Federal Rules of Evidence 702. *See generally* (Docs. ## 92–94.) The motions have been fully briefed. (Docs. ## 98–100, 111.)

## II.   LEGAL STANDARDS

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Fed. R. Evid. 702. Before the expert can offer such opinions,

however, the proponent of the testimony must demonstrate, by a preponderance of the evidence, that the expert's testimony is admissible. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009); *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1220–21 (D. Colo. 2008). To do so, the proponent must establish that "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The trial court acts as a "gatekeeper," reviewing the proffered opinions for both relevance and reliability before determining whether the evidence is admissible under Rule 702. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–95 (1993); *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000). The overarching purpose of the court's inquiry is "to make certain that the expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Goebel*, 346 F.3d at 992 (quoting *Kumho Tire*, 526 U.S. at 152).

Generally, "rejection of expert testimony is the exception rather than the rule." *United States v. Nacchio*, 519 F.3d 1140, 1154 (10th Cir. 2008), *vacated in part on rehearing en banc*, 555 F.3d 1234 (10th Cir. 2009); *see also* Fed. R. Evid. 702, advisory committee's notes to 2000 amendments. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and

appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## III.   DISCUSSION

### A.   STEVEN BJORDAHL

Mr. Bjordahl is an engineer licensed in 27 states with 32 years of experience working as a professional or structural engineer. (Doc. # 120-1 at 104–07.) He has been employed as a structural engineer with ASI since November 2011. (*Id.* at 107.) His first project involving designing or building in the slipform method was in 2011 or 2012 (Doc. # 97-5 at 4.) Mr. Bjordahl was the engineer of record on the Project at issue in this litigation. (*Id.* at 5–6; Doc. # 120 at 181.) Mr. Bjordahl's report purports to:

1. Determine the highest elevation in a silo for which the original design intent is achieved without structural repairs given the following two assumptions:
   a.     all strands below are unusable and
   b.     all strands at or above are usable.
2. Identify the lowest usable strand elevation in each bulkhead array. Then, using the assumption that all strands in that bulkhead array at or above that elevation are usable, determine which silos, if any, would fail to achieve the original design intent of the PT reinforcing.
3. Holding to the usable strand assumption of Assignment 2, design a concrete repair lining which would result in substantial compliance with the original design intent for each silo identified in Assignment 2 as failing to achieve the design intent.

(Doc. # 120-1 at 109.)

Structural makes four arguments as to why Mr. Bjordahl should not be qualified as an expert and his testimony should be excluded. The Court will address each in turn.

1.    Prior Qualification as an Expert Witness

First, Structural argues that Mr. Bjordahl is not qualified to provide expert testimony because he has never been qualified as an expert witness previously. (Doc. # 93 at 6); *see also* (Doc. # 120 at 180.) ASI counters that lack of prior qualification as an expert witness is only one factor courts consider when determining if someone is qualified to testify as an expert. (Doc. # 100 at 8); *Vaughn v. Safeway, Inc.*, No. 14-cv-01066-REB-NYW, 2015 WL 7307936, at *2 (D. Colo. Nov. 20, 2015).

The Court agrees that Mr. Bjordahl is qualified to testify in the area of structural engineering by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Mr. Bjordahl's curriculum vitae shows substantial education and knowledge in the field of structural engineering and in the specific type of construction at issue in this litigation. (Doc. # 97-31 at 24–27; Doc. # 120-1 at 104–07.) As this Court explained in *Vaughn*,

> There is no legal requirement that an expert have previous experience testifying as an expert witness. Of course, such a requirement would eliminate the possibility that a person otherwise qualified as an expert ever could testify as an expert for the first time. Prior expert testimony is just one of many factors which may be considered when assessing qualifications.

2015 WL 7307936, at *2. The Court concludes that, in the context of Mr. Bjordahl's knowledge and experience, his lack of prior qualification as an expert witness does not preclude his qualification in this case.

2.    Bias Due to Employment by ASI

Second, Structural asserts that Mr. Bjordahl should not be qualified as an expert in this case because he is biased in favor of his employer, ASI. (Doc. # 93 at 6–7.) Not only does ASI pay Mr. Bjordahl's salary, but he was also the engineer of record on the

Project. (Doc. # 97-5 at 5–6; Doc. # 120 at 181; Doc. # 120-1 at 107.) Structural avers that this indicates Mr. Bjordahl has "every motivation to provide biased opinion in his and ASI's favor." (Doc. # 93 at 6 (citing *Viterbo v. Dow Chem. Co.*, 646 F. Supp. 1420, 1425-26 (E.D. Tex. 1986)).) ASI disagrees, reasoning that Federal Rule of Civil Procedure 26(a)(2)(B–C), and decisions from this Court expressly allow for qualified employees to serve as expert witnesses. (Doc. # 100 at 8–10 (citing *Mathison v. Wilson*, No. 14-cv-03345-RM-KLM, 2017 WL 4227243, at *3 (D. Colo. Mar. 21, 2017) (internal citations omitted)).) ASI also contends that Structural misconstrues *Viterbo*, and that *Viterbo* is distinguishable from the instant case because Mr. Bjordahl's employment does not depend upon the outcome of this case, and he is not being paid an expert witness fee. (*Id.* at 9–10.)

The fact that an expert witness is also an employee of a party does not preclude qualification as an expert. *See, e.g.*, *Scheidt v. Klein*, 956 F.2d 963, 968 (10th Cir. 1992) (acknowledging expert testimony may be admissible even though related to a party or employee of a party). Rather, "it is the providence of the fact finder to weigh the credibility of witnesses, including witnesses testifying as experts." *Mathison*, 2017 WL 4227243, at *3 (citing *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1042 (7th Cir. 1988)). Additionally, as this case will proceed by bench trial, there are no concerns that a jury will more heavily weigh the testimony of a witness "clothed with the added credibility that insures to experts testifying at trial." *See Conde v. Velsicol Chem. Corp.*, 804 F. Supp. 972, 986 (S.D. Ohio 1992), *aff'd*, 24 F.3d 809 (6th Cir 1994). To the extent that Structural objects to identification of Mr. Bjordahl "as an expert witness on the basis of a

purported conflict of interest, any supposed bias may be questioned on cross examination." *Mathison*, 2017 WL 4227243, at *3.

However, Structural is right to note that lack of objectivity may be the basis for excluding the testimony of a disclosed expert. In *Viterbo*, the court stated that "where an expert becomes an advocate for a cause, he therefore departs from the ranks of an objective expert witness, and any resulting testimony would be unfairly prejudicial and misleading." 646 F. Supp. at 1435. That court deemed the plaintiff's proffered expert had become an advocate because the witness had sought employment from the plaintiff's attorney and had not reviewed the plaintiff's alleged medical conditions objectively. *Id.* The court in *Johnston v. United States*, 597 F. Supp. 374 (D. Kan. 1984), also rejected the testimony of two expert witnesses because they had "become advocates for a cause."  *Id.* at 411. The court concluded one of these witnesses had "become a professional plaintiff's expert witness . . . , and [] identified himself so closely and so consistently with the plaintiff's side in these cases that his testimony must be seen as lacking in credibility due to this obvious bias." *Id.* The other rejected expert witness's demeanor in court demonstrated that he had taken his stance on the issue of his expertise with almost a political-like fervor. *Id.* at 411–12. The court found this "obsession blind[ed] his objectivity[.]" *Id.* at 412.

A related concept is discussed in *Perry v. United States*, 755 F.2d 888, (11th Cir. 1985). There, the reviewing court asserted that "[a] scientist who has a formed opinion as to the answer he is going to find before he even begins his research may be less objective than he needs to be in order to produce reliable scientific results." *Id.* at 892.

Structural refers to no evidence that Mr. Bjordahl has "become[] an advocate" for ASI's cause by failing to review relevant material in an objective manner, by becoming a professional expert witness for similarly situated plaintiffs, or by obsessively asserting his opinions. Structural also has not pointed to any indication that Mr. Bjordahl "formed an opinion as to the answer he is going to find before he [began] his research." Rather, Structural conclusively argues that because Mr. Bjordahl is employed by ASI and was the engineer on the Project, he is biased in favor of ASI's position. (Doc. # 93 at 6.) As discussed above, merely being a party's employee does not disqualify an expert. *Mathison*, 2017 WL 4227243, at *3. The Court will consider Mr. Bjordahl's relationship to ASI and the Project when weighing his testimony. *Id*.

### 3.   Relevance and Reliability of Mr. Bjordahl's Calculation

Structural's final two arguments for exclusion of Mr. Bjordahl's expert testimony and opinions are interrelated. Structural explains that Mr. Bjordahl's final calculation is based on layers of assumptions. (Doc. # 93 at 7–9; Doc. # 111 at 5–6.) According to Structural, these assumptions create a hypothetical reality, resulting in Mr. Bjordahl's ultimate calculation being irrelevant, and therefore not helpful to the trier of fact. (Doc. # 93 at 7–9; Doc. # 111 at 5–6.) Relatedly, Structural insists that the assumptions upon which Mr. Bjordahl based his calculations are contradicted by the evidence, rendering Mr. Bjordahl's final calculation unreliable. (Doc. # 93 at 9–10; Doc. # 111 at 5–6.) Structural does not raise concerns regarding the application of engineering principles and methods to these assumptions. Fed. R. Evid. 702(d).

ASI counters that the issues Structural takes with the assumptions underlying Mr. Bjordahl's report do not impact admissibility. (Doc. # 100 at 11–13.) First, ASI argues that in challenging the accuracy of the assumptions upon which Mr. Bjordahl based his calculation Structural makes a qualitative argument—which relates to weight and should be left to the trier of fact unless directly contradicted by evidence. (*Id.* (citing *Crabbe*, 556 F. Supp. 2d at 1223; *Chimney Rock Pub. Power Dist. v. Tri-State Generation & Transmission Ass'n, Inc.*, No. 10-cv-02349-WJM-KMT, 2014 WL 1715096, at *3 (D. Colo. Apr. 30, 2014)).) Further, ASI asserts that the assumptions were not improper because experts in Mr. Bjordahl's field would not hesitate to use such assumptions when applying reliable principles and methods. (*Id.* at 13 (quoting *Crabbe*, 556 F. Supp. 2d at 1224).) Finally, ASI avers that contrary to Structural's claims, the assumptions underlying Mr. Bjordahl's calculation are grounded in the evidence. (*Id.*)

ASI correctly points out that the test for whether an expert has based their opinion on "sufficient facts or data" is a quantitative, rather than qualitative, analysis. *See* Fed. R. Evid. 702, advisory committee's notes to 2000 amendments; *see also United States v. Lauder*, 409 F.3d 1254, 1264 n.5 (10th Cir. 2005). However, Structural has not challenged the quantity of the underlying facts/assumptions at issue in Mr. Bjordahl's report. Instead, both its arguments related to the relevance and reliability of Mr. Bjordahl's calculation center on appropriateness of the assumptions and their support—or lack thereof—in the evidence. Therefore, the Court's analysis will parallel this focus.

Reliance on assumptions or hypothetical facts does not automatically render a proffered expert opinion irrelevant or unreliable so long as those facts are supported by the evidence. *See* Fed. R. Evid. 702, advisory committee's notes to 2000 amendments ("The language 'facts or data' is broad enough to allow an expert to rely on hypothetical facts that are supported by the evidence."); *Crabbe*, 556 F. Supp. 2d at 1224. "An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record." *Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994); *see also Mitchell v. Gencorp Inc.*, 165 F.3d 778, 783 (10th Cir. 1999) (distinguishing "evidence that is genuinely scientific, [from] unscientific speculation offered by a genuine scientist." (internal quotation marks and citation omitted)). However, "absolute certainty is not required." *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)).

Upon reviewing Mr. Bjordahl's report and relevant portions of the record, the Court finds that the "assumptions" underlying Mr. Bjordahl's final calculation do not render his report and testimony irrelevant or unreliable. Several of the "assumptions" may be better termed parameters. For example, Mr. Bjordahl was first tasked with

> Determine[ing] the highest elevation in a silo for which the original design intent is achieved without structural repairs given the following two assumptions:
> a.     all strands below are unusable and
> b.     all strands at or above are usable.

(Doc. # 120-1 at 109.) As Mr. Bjordahl explained in his expert deposition, his report was attempting to consider

> whatever problems happened to cause the bulkheads to wind up where
> they did, too high; and whatever problems resulted in, essentially, no
> strands available for stressing in the first bulkhead that was there. . . .
> Taking that set of problems and potentially separating it from the fact that
> there are strands missing 30 feet up, that's a — that's a different problem."

(Doc. # 120 at 188–89.) Thus, rather than creating an irrelevant hypothetical reality,

these two initial assumptions served to limit the scope of Mr. Bjordahl's analysis.

Further, the Court disagrees with Structural's arguments that the assumptions

are contradicted by facts in evidence. Structural claims that Mr. Bjordahl was asked to

assume that "the first 5 feet of damage were not Structural's fault." (Doc. # 93 at 9.) Yet,

neither Mr. Bjordahl's report nor his testimony mentions this assumption. (Doc. # 120-1

at 108–13.) Structural also alleges that "[e]vidence shows that the damage to the silo

caused by ASI through bulkhead movement stretched as far as 11 feet into Structural's

portion of the silo." (Doc. # 93 at 9 (citing Doc. # 120-1 at 183, 206.)) There are two

problems with this argument. First, it attempts to contradict the above-referenced

"assumption"—that the first 5 feet of damage were not Structural's fault—which the

Court has already determined is not an assumption underlying Mr. Bjordahl's

calculation. Second, Structural points to no clear evidence of this 11-feet number.

Structural cites to deposition testimony from its engineering expert, Gerald K. Lynskey,

in support of this assertion. However, the portion of the deposition transcript before the

Court, does not provide sufficient context for Mr. Lynskey's reference to "11 feet"—

specifically the Court has only been provided with a partial answer noting that the

"bulkhead issue was concentrated in that first 11 feet or so." (Doc. # 120-1 at 206.)

From this limited excerpt the Court does not know what question was asked of Mr. Lynskey, where this 11-feet figure came from, or its relevance.[2]

The Court concludes there is no evidence directly contradicting Mr. Bjordahl's underlying assumptions, and that these assumptions/parameters are based on the evidence rather than on pure speculation. Application of reliable engineering principles and methods to these assumptions therefore do not require the exclusion of Mr. Bjordahl's report. *See* Fed. R. Evid. 702; *Crabbe*, 556 F. Supp. 2d at 1224. The accuracy and quality of the assumptions and Mr. Bjordahl's reasons for making them may be sufficiently challenged during cross-examination. *Crabbe*, 556 F. Supp. 2d at 1223 ("whether the facts used are qualitatively reliable is a question of the *weight* to be given the opinion by the factfinder, not the *admissibility* of the opinion."); *Chimney Rock*, 2014 WL 1715096, at *3. Accordingly, the Court will not disqualify Mr. Bjordahl as an expert or preclude his testimony.

## B.    MATTHEW HAMLIN

Matthew Hamlin is the Vice President of ASI and has been involved with the company for 35 years. (Doc. # 120 at 57.) His father, Robert Hamlin, is ASI's founder.[3] (*Id.*) During his formal education Matthew Hamlin completed work in construction management, productivity, and efficiency, earning a Bachelor of Science in Economics

---

[2] Structural also cites to a drawing which the Court understands illustrates the location of missing strands in the silo as built, compared to the design. (Doc. # 120-1 at 183.) However, Structural does not explain the relevance of this drawing to the issue of how far damage from bulkhead movement extended, and the Court will not attempt to speculate on this.

[3] To avoid confusion, the Court will refer to Matthew Hamlin and Robert Hamlin with their full names.

and a Master of Business Administration. (*Id.*; Doc. # 97-3 at 7.) Matthew Hamlin identifies himself as a "professional construction contractor." (Doc. # 120 at 58.) He notes that his "expertise is not as deep in the actual construction of the [slip]form itself," but states he has "very deep understanding of the slip form [sic] process once it starts." (*Id.*) He has been involved in various ways—including as an observer, buggy pusher, vibrator, jack operations team member, and deck foreman—during approximately 20 slipform construction projects. (*Id.*) Matthew Hamlin also claims expertise based on his role as "chief estimator for all bids and projects" for the majority of ASI's 30 years of silo construction experience." (*Id.* at 148.) ASI and Matthew Hamlin approximate he has estimated "hundreds if not thousands of silo projects." (Doc. # 98 at 2); *see also* (Doc. # 97-30 at 1–2; Doc. # 120 at 149.)

Matthew Hamlin authored two expert reports in the instant litigation. The first is titled "Expert Witness Report Regarding Productivity Damages ASI Industrial Vs Structural Technologies, LLC" ("First Report"). (Doc. # 120 at 57–64.) This report "details and substantiates the adverse productivity impact caused by [Structural's] poor performance at the [] Project" using "essentially a 'measured mile' type approach." (Doc. # 97-3 at 5–7; Doc. # 120 at 57–58.)[4] The second report, "Expert Witness Report Regarding Silo Repair Costs ASI Industrial Vs [Structural]" ("Second Report"), contains

---

[4] A "measured mile" analysis is "a technique where an expert compares unimpacted construction work to work that has been disrupted and measures the difference." *JH Kelly, LLC v. AECOM Tech. Servs., Inc..*, 605 F. Supp. 3d 1295, 1309 (N.D. Cal. 2022). In this case the "disrupted" work is the Project at issue in the instant litigation, which was "disrupted" by Structural's installation of the unbonded post-tensioning system. (Doc. # 97-3 at 5–6; Doc. # 97-32 at 2; Doc. # 120 at 58.) The "unimpacted" period to which Matthew Hamlin compares the instant Project is a silo construction project outside of Oklahoma City. (Doc. # 97-32 at 2; Doc. # 120 at 58–59.)

a construction cost estimate for repair of the silos based on Mr. Bjordahl's structural analysis and models by Travis Bishop. (Doc. # 97-30 at 1–4.)

Structural argues that Matthew Hamlin should not be qualified as an expert and his testimony should be excluded because (1) he is not qualified to opine on his asserted expertise, (2) he is biased due to his relationship to ASI, and (3) his method of analysis is unreliable. (Doc. # 92.) The Court will address each in turn.

    1.   <u>Qualifications</u>

Structural contends that Matthew Hamlin is not qualified to provide expert testimony because he has never been qualified as an expert witness previously, and because his educational and professional background are not relevant to the testimony he proposes to give. (Doc. # 92 at 7–10); *see also* (Doc. # 120 at 57–58, 149, 176; Doc. # 120-1 at 179–83.) ASI responds that Matthew Hamlin is qualified as an expert on account of his formal education—particularly his course work and thesis in construction management, productivity, and efficiency—combined with over 30 years of experience estimating construction costs for slipform silo construction projects. (Doc. # 98 at 11–13.)

First, as discussed above, "[p]rior expert testimony is just one of many factors which may be considered when assessing qualifications." *Vaughn*, 2015 WL 7307936, at *2. Both Matthew Hamlin's reports focus on the financial and management sides of the Project and not on silo design or engineering. (Doc. # 97-3 at 5–7; Doc. # 97-30 at 3.) Matthew Hamlin's First Report sets out to consider the impacts of Structural's post-tensioning system and related work on the productivity of the Project. In this report

Matthew Hamlin considers factors previously determined by engineers, such as wall height, wall thickness, type of vertical rebar, floor design and support, and the concrete formula. (Doc. # 120 at 60–61.) The report does not purport to opine on the correctness of these factors but rather considers them from the viewpoint of a project manager or general contractor—with an eye towards how each element contributed to completing the work in an efficient manner. (*Id.*) Matthew Hamlin also considers factors which would be beyond the ken of a structural engineer—including personnel, management, and the delivery of materials. (*Id.* at 61–62.) These are considerations within the purview of an individual on the business side of a construction company.

Matthew Hamlin's Second Report is quintessentially a cost analysis. (Doc. # 97-30 at 3.) The report does not engage in any design or engineering work, and rather builds on the "structural analysis and expert report on this very topic by Steve Bjordahl" discussed above. (*Id.*) Mr. Bjordahl's designs are then "utilized . . . to estimate the costs to implement [his] solutions." (*Id.*) Again, in this report Matthew Hamlin considers many factors—including labor and material costs—which would be outside the purview of an engineer, but squarely in the wheelhouse of someone with experience estimating construction costs.

Matthew Hamlin's formal education in economics and business administration, in addition to his 30 years of experience estimating construction costs and working on silo slipform construction projects is directly relevant to the subjects of his two reports. (Doc. # 120 at 57–58; 148–49.) In this context, Matthew Hamlin's lack of prior qualification as an expert witness does not require the exclusion of his proposed expert testimony.

*Vaughn*, 2015 WL 7307936, at *2. Contrary to Structural's claims, Matthew Hamlin's statements that his "expertise is not as deep in the actual construction of the [slip]form itself before slip operations commence . . ." (Doc. # 120 at 58), and that he is not an engineer or expert in post-tensioning (Doc. # 120-1 at 179), are not admissions of lack of qualifications to opine on his designated area of expertise. Rather these are honest statements noting the boundaries of his knowledge. Matthew Hamlin's reports do not attempt to cross these boundaries to opine on areas such as design or engineering. (Doc. # 120 at 57–64; 148–51); *see also Conroy v. Vilsack*, 707 F.3d 1163, 1169 (10th Cir. 2013) (explaining that expert testimony must "fall within the reasonable confines of [the witness's] expertise.")

Therefore, the Court finds that Matthew Hamlin is qualified by "such skill, experience or knowledge" in productivity and silo repair costs "as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth."[5] *Graham v. Wyeth Labs*, 906 F.2d 1399, 1408 (10th Cir. 1990); *see also* (Doc. # 120 at 176.)

---

[5] Structural also argues that if the Court granted its motion to disqualify or exclude the testimony of Mr. Bjordahl, (Doc. # 93), "that would in turn render [Matthew Hamlin's Second Report] also disqualified due to [Matthew] Hamlin's wholesale reliance on [Mr.] Bjordahl therein." (Doc. # 92 at 13.) However, as discussed above, Mr. Bjordahl's report and testimony are admissible under Rule 702, and Matthew Hamlin's reliance on Mr. Bjordahl's design and engineering expertise is permissible. Fed R. Evid. 703 (allowing experts to rely upon facts "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject"); *see also Bullock v. Daimler Trucks N. Am., LLC*, No. 08-cv-00491-PAB-MEH, 2010 WL 4135330, at *2 (D. Colo. Sept. 30, 2010).

2.      <u>Bias Due to Employment by ASI</u>

Similar to the arguments discussed above regarding Mr. Bjordahl's potential bias, Structural insists that Matthew Hamlin should be precluded from testifying as an expert due to his relationship to ASI. (Doc. # 92 at 8.) Structural points out that not only is Matthew Hamlin an employee of ASI, he is also the son of ASI's founder, Robert Hamlin.[6] (*Id.*); (Doc. # 120 at 57.) However, Structural's arguments that Matthew Hamlin should be disqualified as an expert because of his potential bias suffer from the same flaws as its parallel arguments related to Mr. Bjordahl. Again, the Court is not aware of any evidence that Matthew Hamlin has "become[] an advocate" for ASI's cause or that he formed an opinion as to the outcome of his reports prior to engaging in the analysis. *Perry*, 755 F.2d at 892; *Viterbo*, 646 F. Supp. at 1435; *Johnston*, 597 F. Supp. at 411–12.

As discussed above, the fact that a witness is also an employee of a party—or even the party itself—does not preclude qualification as an expert. *See, e.g.*, *Tagatz*, 861 F.2d at 1042 (concluding that a party could testify as its own expert and noting that "the fact that a party testifying as his own expert is not disinterested does not distinguish him from any other party who testifies in his own behalf; [or from] hired experts, who generally are highly compensated"). Structural's conclusive assertions that Matthew Hamlin is biased in favor of ASI because of his relationship to the company are

---

[6] Structural also asserts that Matthew Hamlin is a shareholder who stands to gain financially from the outcome of this litigation. (Doc. # 92 at 8.) However, it has not cited to evidence in the record to support this claim.

insufficient to disqualify him from testifying as an expert but will be considered when the

Court assesses weight. *Mathison*, 2017 WL 4227243, at *3.

> 3.   <u>Reliability of Matthew Hamlin's Measured Mile Analysis</u>

Structural's final argument as it relates to the proposed expert testimony of

Matthew Hamlin is that the measured mile analysis—that is the "reasoning or

methodology underlying [his] testimony"—is unreliable and has not been properly

applied to the facts of the instant case. (Doc. # 92 at 13–19); *Daubert*, 509 U.S. at 592–

93. This argument applies only to Matthew Hamlin's First Report. (Doc. # 120 at 57–64.)

Structural does not challenge the reliability of a correctly completed measured mile

analysis, but rather asserts that the "'measured mile' type approach," (*Id.* at 58),

Matthew Hamlin conducted "is not scientifically valid or properly applied." (Doc. # 92 at

13); *see also Flatiron-Lane v. Case Atl. Co.*, 121 F. Supp. 3d 515, 542 (M.D.N.C. 2015)

(explaining that the measured mile method is "viewed judicially as [the] most acceptable

for proving loss of productivity damages." (internal quotation marks and citation

omitted)).

Specifically, Structural avers that the two projects Matthew Hamlin purports to

compare in order to calculate the productivity damages of Structural's alleged breach—

the Project at the heart of this litigation and a 2-pack silo project near Oklahoma City

("the Oklahoma Project")—are not "reasonably similar" as required for a proper

measured mile analysis. (Doc. # 92 at 4–6, 14–19.) Structural also argues that the

analysis fails to account for ASI's own, allegedly admitted, role in causing the first row of

bulkheads to end up several feet above the elevation where they should have started.

(*Id.* at 16.) Finally, Structural asserts that even if Matthew Hamlin is generally qualified to opine on productivity and silo repair costs, he is not qualified to conduct a measured mile analysis because he had never conducted such an analysis previously and only learned what a measured mile analysis was through the course of the instant litigation. (*Id.* at 9, 18 (citing Doc. # 120-1 at 181.[7]))

ASI counters that the two projects whose comparison form the basis of Matthew Hamlin's measured mile analysis are "nearly identical slipform scopes from silo bottom to top except for, of course, the horizontal reinforcement" for which Structural was responsible in the instant Project. (Doc. # 98 at 16.) ASI also contends that the case law Structural cites in support of excluding Matthew Hamlin's First Report is distinguishable from the instant litigation and that any "alleged deficiencies" in the application of a reliable methodology goes "to the weight of the evidence and not to its admissibility." (*Id.* (citing *United States v. Rubio-Sepulveda*, No. 14-cr-00144-CMA, 2017 WL 11454729, at *3 (D. Colo. Aug. 10, 2017); *Rivera v. Volvo Cars of N. Am., LLC*, No. 13-00397 KG/KBM, 2015 WL 11118065, at *6 (D.N.M. May 28, 2015) (Any, "perceived weaknesses in [an expert's] application of h[is] methodology as to the facts go to the weight of the testimony, not its admissibility.")))

Initially, merely because this is allegedly Matthew Hamlin's first time conducting a measured mile analysis does not automatically render his resulting expert testimony

---

[7] Although Structural appears to quote from Matthew Hamlin's expert deposition, the full quotation does not appear in the materials before the Court. *Compare* (Doc. # 92 at 9), *with* (Doc. # 120-1 at 181–82.) However, ASI does not challenge the quote so the Court will presume that Structural correctly quoted the deposition.

inadmissible.  Rule 702 sets a "liberal standard" for qualifying a witness as an expert. *United States v. Gomez*, 67 F.3d 1515, 1525–26 (10th Cir. 1995). The Rule requires only that an expert possess "knowledge, skill, experience, training or education" sufficient to assist the trier of fact. Fed R. Evid. 702. That requirement is "satisfied where the expert testimony advances the trier of fact's understanding **to any degree**." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) (emphasis added) (quoting 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure: Evidence* § 6265 (1997)). It is not necessary for experts to be "blue-ribbon practitioners" with "optimal qualifications." *See United States v. Mahone*, 453 F.3d 68, 71 (1st Cir. 2006). Rather, it is an abuse of discretion to exclude a witness as an expert if the witness is generally qualified. *See Obeslo v. Great-West Capital Mgmt., LLC*, No. 16-cv-00230-CMA-SKC, 2019 WL 1651844, at *3 (D. Colo. Apr. 17, 2019); *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) ("We have eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications."). Accordingly, "[g]aps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility." *Robinson*, 447 F.3d at 1100 (quoting 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure: Evidence* § 6265 (1997)).

The Court has already deemed Matthew Hamlin qualified by his education and experience to opine on construction productivity. Therefore, the Court will not exclude his First Report solely based on his limited experience with measured mile analyses. *See Lovato v. Burlington N. & Santa Fe Ry. Co.*, No. CIV.A. 00-RB-2584CBS, 2002 WL

1424599, at *4 (D. Colo. June 24, 2002) (concluding that an expert's undisputed lack of experience in the specific point of dispute was not dispositive of his qualifications and collecting similar cases). Rather, this limited experience will be considered by the Court when evaluating the weight of Matthew Hamlin's testimony. *Id.*

A measured mile analysis compares unimpacted construction work to work which has been disrupted. *JH Kelly, LLC v. AECOM Tech. Servs., Inc..*, 605 F. Supp. 3d 1295, 1309 (N.D. Cal. 2022); *see also Appeal of P.J. Dick Inc.*, VABCA 5597 et al., 2001-2 BCA ¶31,647, *aff'd. in part, rev'd. remanded, and vacated in part on other grounds*, *P.J. Dick, Inc. v. Principi*, 324 F.3d 1364 (Fed. Cir. 2003) (explaining that this method attempts to set up a "but-for" comparison to isolate the cost attributable to the impacted period). The parties agree that for this comparison to be reliable, the unimpacted and impacted work must be "reasonably similar." (Doc. # 93 at 5–6, 14–18); (Doc. # 98 at 16–19); see also *Allied Erecting & Dismantling Co. v. U.S. Steel Corp.*, No. 4:12-cv-1390, 2015 WL 1530648, at *16 (N.D. Ohio Apr. 6, 2015) ("[A measured mile] comparison will be accepted if it is between kinds of work that are reasonably alike, such that the approximations it involves will be meaningful to a fact finder."). The parties do not point to, and the Court is not aware of, any binding precedential decisions expanding on what it means for two projects to be "reasonably similar," but the Court will look to opinions of other courts as persuasive authority.

The Veterans Administration Board of Contract Appeals has found no basis to conclude that for a measure mile analysis to be reliable, it must compare periods of work on the same project. *Appeal of P.J. Dick Inc.*, VABCA 5597 et al., 2001-2 BCA

¶31,647 (concluding that an expert's measured mile analysis was "reasonable and valid" where labor, materials, weather conditions, and area of installation were the same between two projects despite some differences). Further, the General Services Board of Contract Appeals has noted that it would be "surprised to learn that worked performed in periods being compared is ever identical on a construction project, . . . and it need not be; the ascertainment of damages for labor inefficiency is not susceptible to absolute exactness." *Clark Contractors, Inc. v. Gen. Servs. Admin.*, GSBCA 14340, 99-1 BCA ¶ 30,280. Additionally, the measured mile analysis "requires subjective judgment calls by the expert," and as such, a court considering the admissibility of such an analysis "would be particularly concerned to know how the expert[] picked periods of productive and non-productive construction for comparison." *Daewoo Eng'g and Constr. Co., Ltd. v. United States*, 73 Fed. Cl. 547, 580–81 (2006). Where such choices were arbitrary or chosen to achieve a pre-determined result, exclusion of a measured mile analysis may be appropriate. *Id.* at 581.

As a foundation for its argument that Matthew Hamlin's measured mile analysis is unreliable, Structural points to the following differences between the Project and the Oklahoma Project: (1) location (Eaton, Colorado, versus Oklahoma City, Oklahoma), (2) quantity (six silos versus two), (3) quantity of men and equipment required, and (4) type of horizontal concrete reinforcement materials/equipment (post-tensioning cables versus re-bar). (Doc. # 92 at 15–16); *see also* (Doc. # 120 at 62–63.) However, ASI notes the following similarities: (1) "project design (wall height, silo diameter, wall thickness, vertical rebar used, hopper, etc.)," (2) the crew (including workers and

management), and (3) methodology of construction. (Doc. # 93 at 18); *see also* (Doc. # 120 at 59–62.)

In his First Report Matthew Hamlin lists many of these similarities and differences and provides detailed explanations for why the differences do not defeat the measured mile analysis. (Doc. # 120 at 59–63.) After reviewing these explanations, the Court believes the selection of the Oklahoma Project as the point of comparison was not "arbitrary or chosen to achieve a pre-determined result." *Daewoo Engineering*, 73 Fed. Cl. at 581. Further, the fact that the type of horizontal concrete reinforcement materials/equipment is different between the two projects does not undermine the measured mile analysis because that is precisely the difference Matthew Hamlin is attempting to measure. The Court will consider the remaining differences between the two projects when assessing what weight to assign to Matthew Hamlin's testimony. *Rubio-Sepulveda*, 2017 WL 11454729, at *3. However, the Court finds that ASI has established Matthew Hamlin's First Report is "the product of reliable principles and methods" which have been "reliably applied . . . to the facts of the case." Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 592–93.

In summary, upon reviewing Matthew Hamlin's two reports and relevant portions of the record, the Court will not disqualify Matthew Hamlin as an expert or preclude his testimony as outlined in his First and Second Reports.

## C.    MATTHEW BLACKMER

Matthew Blackmer is a civil engineer with a Bachelor of Science in Civil Engineering and a Master of Science in Civil Engineering with an emphasis in Structural

Engineering. (Doc. # 120 at 191.) During his formal education Mr. Blackmer took courses related to the subject of this litigation including Design of Concrete, Structures Construction Site Engineering, Advanced Topics in Reinforced Concrete, and Condition Assessment/Failure Analysis of Structures. (Doc. # 97-34 at 1–2, 4, 6; Doc. # 97-36 at 9, 11.) Following graduation, Mr. Blackmer has engaged in continuing education including courses in "Evaluation & Repair of Concrete Structures," "Basics on Forensic Engineering" parts I, II, and III, "Post-Tensioning Construction and Design," and "the 2012 International Building Code – Structural Design." (Doc. # 97-34 at 2; Doc. # 97-37 at 13–15.) Mr. Blackmer also completed coursework through the American Concrete Institute ("ACI") during which new requirements for post-tensioning imposed by the Post-Tension Institute ("PTI") were covered. (Doc. # 97-34 at 2; Doc. # 97-36 at 12–13.)

Mr. Blackmer is licensed as a professional engineer in 8 states, including in Colorado, and is a professional member of the Structural Engineers Association of Colorado. (Doc. # 120 at 191.) His current and previous employment involved peer reviewing construction projects during which he reviews, analyzes, and comments on structural, civil, and geotechnical designs of construction projects for design issues prior to construction including post-tension projects such as hospitals, parking garages, office buildings, and multi-family structures. (Doc. # 97-34 at 3; Doc. # 97-36 at 21–22.) Mr. Blackmer has also worked with post-tensioning companies on repairs and has designed post-tension enforced concrete structures themselves, although this was slab or grade concrete work (as opposed to silo or cylindrical work) and occurred prior to his licensure. (Doc. # 97-36 at 3–4, 8, 15–16.) He has worked alongside post-tensioning

crews and has coordinated post-tensioning installation. (*Id.* at 5–7.) Mr. Blackmer has been exposed to cylindrical slipform work through a claim he worked on involving water tanks. (*Id.* at 5–7.)

However, Mr. Blackmer admits that he has never designed an industrial slipform system or worked on a silo or slipform project. (Doc. # 120 at 297–98, 301.) He has not worked for a contractor that did slipform work and has not used the related equipment. (*Id.* at 301.) Further, Mr. Blackmer has not received training by PTI (*id.* at 294)—which ASI asserts is "the gold standard in post-tensioning education and standards." (Doc. # 99 at 4.) He has never presented or published on post-tensioning or slipform construction. (Doc. # 120 at 299–300.)

Mr. Blackmer authored a report on behalf of ASI in which he "conducted an engineering evaluation of the installation of the unbonded post-tensioning scope of work performed by Structural . . . at the [Project]." (*Id.* at 207.) Mr. Blackmer's findings include opinions that several of PTI's and ACI's standards "outline the standard of care for Structural []." (*Id.* at 217–21.) ASI asserts that Mr. Blackmer is qualified to conduct this evaluation by his experience writing hundreds of reports in which he applies codes and standards applicable to a contractor's work and then opines on the applicable standard of care. (Doc. # 97-34 at 2; 97-36 at 2.) Mr. Blackmer has been qualified to testify as a civil, structural, and/or forensic engineer in five Colorado state court cases, several arbitrations, and one mediation. (Doc. # 97-37 at 7–13.) The Court notes that, from Mr. Blackmer's descriptions of his testimony in these matters, it does not appear that he testified regarding post-tensioning or slipform construction. (*Id.*)

Structural presents two arguments for the disqualification and/or exclusion of Mr. Blackmer's testimony. First, it insists that Mr. Blackmer "lacks the necessary training, knowledge, and education to qualify as an expert in slipform design." (Doc. # 94 at 3, 5–8.) Next, Structural argues that Mr. Blackmer's report attempts to apply standards which are irrelevant and inapplicable because they were not included or referenced in the subcontract. (*Id.* at 8–11.)

    1.   <u>Qualifications</u>

In its counterargument ASI notes that Rule 702 does not require "[e]xpertise in a specialized area directly related to the issue in question . . . as long as the expert stays within the 'reasonable confines' of his subject area." *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1084 (D. Colo. 2006) (internal citations omitted). This accords with the Court's previous discussion in which it noted that Rule 702's standards are "liberal" and its requirements that an expert be qualified by "knowledge, skill, experience, training or education," is met where their testimony "advances the trier of fact's understanding to any degree." Fed. R. Evid. 702; *Gomez*, 67 F.3d at 1525–26; *Robinson*, 447 F.3d at 1100. Structural has not pointed to case law which articulates a different standard. (Doc. # 94 at 3, 5–8.) Therefore, the Court concludes that Mr. Blackmer is qualified to testify as an expert within the area of structural engineering. Any gaps in Mr. Blackmer's qualifications or knowledge will go to the weight the Court assigns to his testimony. *Robinson*, 447 F.3d at 1100.

2.    <u>Application of Standards</u>

Structural avers that the ACI and PTI standards Mr. Blackmer applies to the Project and Structural's work fail to "fit" the instant litigation. (Doc. # 94 at 9–11.) In other words, they are not relevant. *Daubert*, 509 U.S. at 591; *Bitler v. A.O. Smith Corp*., 400 F.3d 1227, 1234 (10th Cir. 2005). Structural's basis for this argument is the subcontract, which Structural claims contains only one reference to a standard: ACI 301-10. (Doc. # 94 at 8–9 (citing Doc. # 120-1 at 3.)) However, Structural contends that this standard does not apply to its work because "by its plain language, [it] explicitly states that the model specification does not apply to slipform concrete wall construction." (*Id.* at 9–10 (citing Doc. # 120-1 at 1, 3, 23–29.)) Structural claims that its subcontract with ASI was a "fully integrated agreement" and therefore only standards referenced therein can be applied to the Project. (Doc. # 111 at 10–11 (citing Doc. # 120 at 17.))

ASI disagrees—arguing that Structural's position is "patently absurd as Structural had to perform to some standard to know whether it was in conformance with the Subcontract." (Doc. # 99 at 11.) According to ASI, the subcontract expressly incorporates other documents. First the structural drawings—one of which, (Doc. # 97-38 at 1), notes that all concrete work must be completed pursuant to ACI 301-10. (Doc. # 99 at 13 (citing (Doc. #97-28 at 4.)) ASI contends that the language excluding slipform work from the parameters of ACI 301-10 is irrelevant because Structural did not object to the applicability of this standard prior to executing the subcontract. (*Id.*) Second, ASI states that the subcontract incorporates the prime contract, (Doc. # 97-27 at 3), which

requires that "all construction services . . . be performed in a good and workmanlike way in accordance with the standards applicable to the work . . . ." (Doc. # 99 at 12–13 (citing (Doc. #97-28 at 4.)) ASI asserts that Mr. Blackmer is qualified to opine on which standards define "good and workmanlike" concrete work. (*Id*. at 13–14.)

The Court agrees with ASI. Colorado courts construe contracts in the manner which "best effectuates the intent of the parties." *Allstate Ins. Co. v. Avis Rent-A-Car Sys., Inc.*, 947 P.2d 341, 346 (Colo. 1997). The subcontract at issue in this case states that

> Subcontractor shall . . . perform all the work necessary or incidentally required for the completion, strictly pursuant to and as reasonably inferred from: this Subcontract and plans and specifications for the Project, the contract between the Contractor and Owner for the Project (. . . "the Prime Contract"), . . . and all Exhibits Identified and Incorporated by reference into this Subcontract . . .

(Doc. # 97-27 at 4.) As pointed out by ASI, the primary contract contains an express warranty of "good and workmanlike" construction. (Doc. #97-28 at 4.) This language implies that parties intended for the work outlined in the subcontract to be completed in a "good and workmanlike" manner.

Where—as here—such a standard of care requires specialized or technical knowledge on the part of the factfinder, "the party asserting a breach of the standard of care must put on evidence of what that standard is, either by expert testimony, . . . or some other proof of what would typically be expected of a competent actor in the field." *Sterling Constr. Mgmt., LLC v. Steadfast Ins. Co.*, No. 09-cv-02224-MSK-MJW, 2011 WL 3903074, at *4 (D. Colo. Sept. 6, 2011) (citing *Hice v. Lott*, 223 P.3d 139, 143 (Colo. App. 2009)). Upon review of Mr. Blackmer's report and relevant portions of the record,

the Court concludes that Mr. Blackmer is qualified to opine on what standard of care was applicable under the circumstances of the instant litigation and that such expert testimony would be relevant and helpful to the trier of fact. Structural may challenge Mr. Blackmer's opinions during cross examination.[8]

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Court DENIES the following motions by Defendant/Counter Claimant Structural Technologies, LLC:

- "Motion *in Limine* to Disqualify Matthew Hamlin from or Precluding him from Testifying as an Expert Witness" (Doc. # 92);

- "Motion *in Limine* to Exclude Expert Testimony from Steven Bjordahl" (Doc. # 93); and

- "Motion *in Limine* to Exclude Expert Testimony from Matthew Blackmer or to Disqualify Matthew Blackmer as an Expert Witness" (Doc. # 94).

DATED: May 16, 2023

BY THE COURT:

CHRISTINE M. ARGUELLO
Senior United States District Judge

---

[8] Structural also argues that any attempt to impose standards of care not referenced in the subcontract violates Colorado's Economic Loss Rule. (Doc. # 94. at 11–12.) The Court will consider this argument in the context of the Motion for Summary Judgment (Doc. # 91.)