IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello

Civil Action No. 19-cv-02238-CMA-STV

AGRI-SYSTEMS, a Montana corporation, *d/b/a* ASI Industrial,

    Plaintiff,

v.

STRUCTURAL TECHNOLOGIES, LLC, a Maryland limited liability company,

    Defendant.

---

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

This matter is before the Court on Defendant/Counter Claimant Structural Technologies, LLC's ("Structural") Motion for Summary Judgment. (Doc. # 91.) For the following reasons, the Court denies the Motion.

### I.    BACKGROUND[1]

This is a construction contract case centered around the design and construction of a silo facility in Eaton, Colorado ("the Project"). The core issue of this case revolves around determining who was at fault for problems which arose during the Project's construction, and who is responsible for the required repairs. (Doc. # 2; Doc. # 31 at ¶¶ 21–54); *see also* (Doc. # 93 at 2); (Doc. # 100 at 14.) Plaintiff/Counter Defendant Agri-Systems, d/b/a ASI Industrial ("ASI") contracted ("the Design/Build Agreement") to build

---

[1] Unless otherwise indicated, the following material facts are undisputed. (Doc. # 91 at 3–21; Doc. # 96 at 2–23; Doc. # 112 at 2–18.)

the silos using a slipform concrete construction method where concrete is poured in a single continuous pour as the form/mold moves vertically upward. (Doc. # 31 at ¶¶ 7–8.) Under the Project's Design/Build Agreement, ASI was responsible for the overall design of the silos. (Doc. # 120 at 42–44; Doc. # 120-1 at 132.) ASI then subcontracted with Structural ("the Subcontract") to provide "unbonded post-tensioning tendons . . . and anchors" as well as related placement drawings, supervision, labor, and equipment. (Doc. # 31-1.)

Specifically, the Subcontract dictated that Structural's scope of work was as follows:

- Furnish VSL unbonded post-tensioning tendons including .60" diameter 270 ksi coated and sheathed prestressing strand, and anchorages (bearing plate, recess former and wedges). The Total Cost is based on 163 strander per silo for a total of 978 strands approximately 140 ft. in length. All strands are 360 degrees around the silo and tension from both ends for a total of 1,956 anchorages. The post-tensioned height is assumed as 80 ft. beginning 40 ft. above the foundation.
- Furnish supervision, labor, and equipment to install strand channels to slip from yokes, install strands during slip operations, remove recess forms, tension strands and remove stressing tails.
- Furnish placement drawings for VSL post-tensioning work.

(Doc. # 31-1 at 2.) Expressly excluded from Structural's scope of work was:

- Furnishing and placement of all mild steel reinforcing,
- All carpentry work including bulkheads, formwork, shoring, scaffolding, and design thereof,
- All concrete work including furnishing, placing, finishing, and ouring,
- Union labor and prevailing wage requirements,
- Material sampling and testing,
- Domestic origin material requirements,
- Cost of bonds, sales taxes, use taxes, permits and licenses.

2

(*Id.*) The Subcontract contained an express warranty which stated in part that "[Structural] represents and warrants to [ASI] that it and its employees are experienced and skilled in the construction of structures and improvements of the type described in the Contract Documents . . . ." (*Id.* at 3.) Finally, the Subcontract also contained an integration clause which stated, "[t]his Subcontract reflects the complete and full agreement between the parties and there exist no other agreements or understandings, whether verbal or written." (*Id.* at 17.)

The strength of the silos comes from reinforcing steel imbedded in the concrete during construction. (Doc. # 31 at ¶ 9; Doc. # 91 at 8–9.) The idea to use unbonded post-tensioning tendons in the silos to provide this strength originated with Structural's Professional Engineer Dan Harger. (Doc. # 97-9 at 3; Doc. # 97-33 at 2); *see also* (Doc. # 96 at 14; Doc. # 112 at 9.) ASI then made the decision to use Structural's post-tensioning tendons rather than "regular rebar." (Doc. # 120 at 34.) Post-tensioning reinforcing steel must be accessible after the concrete is cured so that it can be stressed. (Doc. # 120-1 at 411); *see also* (Doc. # 91 at 9.) To do this in the instant Project, bulkheads with predefined hole configurations were to be fed into the slipform at designated heights. (Doc. # 120-1 at 411.) These bulkheads (the "sliding bulkheads") were designed to remain at their designated elevations in the face of the concrete as the slipform continued to rise vertically. (*Id.*) *see also* (Doc. # 91 at 8–9.)

Prior to executing the Subcontract, ASI and Structural communicated and collaborated around the integration of Mr. Harger's proposal, including the concept and application of the sliding bulkheads, into the overall engineering designs for the silos.

3

(Doc. # 97-5 at 6, 8, 20–21.) Structural provided concept drawings and engineering calculations which ASI then integrated into its design work. (Doc. # 97-5 at 20–21; Doc. # 97-20 at 1–8; Doc. # 97-25 at 2–13; Doc. # 113 at 17–18.) ASI fabricated the bulkheads. (Doc. # 120 at 37–38, 47.) ASI's Structural Engineer, and the engineer of record on the project, Steven Bjordahl explained during his deposition that he was "looking to [Structural] to show us" how to "install unbonded tendons in a slip form [sic], because [ASI] hadn't done it before." (Doc. # 97-5 at 20; Doc. # 120 at 33, 42–43.) As the engineer of record, Mr. Bjordahl created and stamped the structural design drawings for the Project. (Doc. # 113 at 17; Doc. # 120 at 33–34, 42–44); *see also, e.g.*, (Doc. # 120 at 75; Doc. # 120-1 at 213.)

Prior to the Project at issue in this case, Structural's employees had varying levels of training, experience, and certifications in bonded post-tensioning work and/or slipform construction—but no Structural employee had experience, training, or certifications specifically in unbonded post-tensioning work as installed in slipform construction. (Doc. # 97-8 at 2–4; Doc. # 97-12 at 2–4; Doc. # 97-18 at 2.) To facilitate its responsibilities under the Subcontract, Structural hired laborers who were less experienced in construction and some of whom walked off the job. (Doc. # 97-1 at 3, 10; Doc. # 97-10 at 7; Doc. # 97-11 at 2, 4; Doc. # 97-12 at 11; Doc. # 97-15 at 1; Doc. # 97-16 at 1; Doc. # 97-18 at 2; Doc. # 97-22 at 1–3.)

The post-tensioning work in the silos was to begin at an elevation of 140 feet (40 feet above the foundation). (Doc. # 120 at 2.) During construction, issues arose with the first row of bulkheads to which Structural was to install the ends of the post-tension

4

tendons, resulting in the bulkheads ending up several feet above the elevation where they should have started. (*Id.* at 26–27, 46, 49–51, 303); *see also* (Doc. # 91 at 9; Doc. # 97-23 at 1; Doc. # 97-31 at 2.) Structural argues that these issues resulted in additional complications—creating a type of domino effect—as the slipform continued to rise vertically, resulting in its inability to complete its work as outlined by the Subcontract. (Doc. # 91 at 9–13; Doc. # 120 at 36–38; 49–50); *see also* (Doc. # 93 at 2.) ASI, however, counters that "the effect of the bulk heads [sic] moving is limited to elevations less than 5' above the start of the post tensioning system[, and if Structural] had installed strands in the bulkheads . . . little to no repairs to the silos would have been necessary." (Doc. # 120 at 148.) The as-built drawings appear to demonstrate many missing and/or unstressed post-tensioning tendons. (Doc. # 120-1 at 183–90); *see also* (*id.* at 134–35; Doc. # 97-15 at 1.) However, neither party kept a log of placed strands during construction. (Doc. # 97-9 at 12–14.)

As a result of the missing and/or unstressed tendons, the design and installation of a liner was required to ensure that the silos met the design criteria for strength and/or "performance or serviceability" (the prevention of cracking in the concrete which would cause the sand stored in the silos to leak out or water to leak in). *See* (Doc. # 97-5 at 15; Doc. # 97-6 at 2, 5); *see also* (Doc. # 120-1 at 132–35.) The resulting liner ASI installed was 30 inches thick and 15 to 18 feet tall. *See* (Doc. # 120 at 32.) The thickness of the liner was directly attributable to a second issue that arose during construction—referred to as "the Pilaster issue." (Doc. # 97-5 at 12; Doc. # 97-6 at 5; Doc. # 120 at 31–32, 187; Doc. # 120-1 at 201.) Pilasters are "load bearing column[s]

5

that's integral within the wall." (Doc. # 120 at 27.) In the Project's silos, the pilasters were supposed to stop at elevation 136 feet (four feet below where Structural's work was planned to begin). (*Id.* at 28.) For this to occur, an "insert had to be installed in the [slip]form to block off concrete from being poured where the pilasters had been prior." (*Id.*) However, some of "those inserts somehow adhered to the concrete," failing to "ride up" with the form. (*Id.*) As a result, concrete continued to be poured for the pilasters—resulting in some pilasters that were "18, 20 feet overrun." (*Id.*) The resulting 30-inch-thick liner required more material than a six inch-thick, five-foot-tall liner. (Doc. # 120 at 32.) ASI claims the cost of this liner as part of its damages. (Doc. # 31 at ¶¶ 31–35; *see also* (Doc. # 10.)

ASI filed this lawsuit in Colorado state court on July 11, 2019 (Doc. # 1-1), and on August 7, 2019, Structural removed the case to Federal Court (Doc. # 1). ASI's Amended Complaint asserts four claims for relief: (1) breach of contract, (2) breach of warranty, (3) professional negligence, and (4) negligent misrepresentation. (Doc. # 31 at ¶¶ 28–54.) Structural has also asserted one counterclaim for breach of contract against ASI. (Doc. # 2 at 8–13.)

Both sides retained a number of experts. On November 23, 2023, Structural filed the instant Motion for Summary Judgment, seeking judgment as a matter of law on all four of ASI's claims.[2] Simultaneously, Structural filed three "Motions *in Limine*" seeking

---

[2] In the instant motion Structural repeatedly asserts that ASI holds the ultimate burden of proof at trial (Doc. # 91 at 22 n.3, 24–25), which is true as it relates to ASI's claims only. *W. Distributing Co. v. Diodosio*, 841 P.2d 1053, 1057 (Colo. 1992). Therefore, the Court understands Structural to only be seeking summary judgment on ASI's claims and Structural's own counterclaim is not before the Court at this time.

to disqualify ASI's disclosed experts Steven Bjordahl, Matthew Hamlin, and Matthew Blackmer and/or exclude their testimony pursuant to Federal Rules of Evidence 702. (Docs. # 92–94.) The Court denied these Motions on May 16, 2023. (Doc. # 124.)[3] The Motion for Summary Judgment has been fully briefed and is now ripe for review. (Docs. ## 96, 112.)

## II.     LEGAL STANDARDS

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okla.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *See id.* However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

---

[3] In the instant motion Structural argues, inter alia, that if the Court were to grant its "Motions *in Limine*," a grant of the instant motion would be required because ASI would not be able to present sufficient expert testimony to establish its claims. (Doc. # 91 at 27–29.) However, because the Court previously denied Structural's "Motions *in Limine*," this argument is moot, and the Court does not address it further. *See* (Doc. # 124.)

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. Stated differently, the party must provide "significantly probative evidence" that would support a verdict in his favor. *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671.

## III. DISCUSSION[4]

### A. BREACH OF CONTRACT

ASI's first cause of action alleges that Structural breached the Subcontract by

   a. . . . fail[ing] to properly design and/or install post-tensioning strands in the silos in a good and workmanlike manner, free from defects, and in conformance to the requirements of the Subcontract. In some instances, Structural['s] negligence included a failure to install the post-tensioning strands at all and, in other instances, the post-tensioning strands were installed in a negligent and defective manner.
   b. . . . fail[ing] to supply a work force sufficient in number and skills to perform work of the nature required
   c. . . . fail[ing] to perform the work required under the Subcontract in accordance with the schedule required, or to maintain sufficient progress, to permit construction of the silos under the slip form [sic] method contemplated under the Subcontract.
   d. . . . fail[ing] to cure negligent and defective work which it had performed following notice and demand by ASI.

(Doc. # 31 at ¶ 29.) A breach of contract claim requires the plaintiff to establish (1) the existence of a contract, (2) performance by the plaintiff or justification for nonperformance, (3) failure to perform by defendant, and (4) damages. *W. Distributing*

---

[4] This case is before the Court pursuant to diversity jurisdiction. (Doc. # 31 at ¶¶ 3–5; Doc. # Doc. # 33 at ¶¶ 3–5.) A federal district court sitting in diversity must apply the choice of law rules of the state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Consistent with the Restatement (Second) of Conflict of Laws § 187 (1971), adopted by Colorado, Colorado courts "apply the law chosen by the parties unless there is no reasonable basis for their choice or unless applying the chosen state's law would be contrary to the fundamental policy of the state whose law would otherwise govern." *Target Corp. v. Prestige Maint. USA, Ltd.*, 351 P.3d 493, 497 (Colo. App. 2013); *see also, e.g., Wood Bros. Homes, Inc. v. Walker Adjustment Bureau*, 601 P.2d 1369, 1372 (1979) ("[W]e now adopt the Restatement (Second) [of Conflict of Laws] approach for contract actions."). The Subcontract provides that it "shall be construed, enforced, and performed in accordance with the laws of the State of Montana, without regard to Montana's principles of conflict of laws." (Doc. # 31-1 at 17.) However, neither party has made any arguments regarding choice of law, and both parties have relied upon and referenced Colorado law throughout their briefs. (Doc. # 91 at 22 n.3, 29, 32, 34; Doc. # 96 at 24, 28, 33–35; Doc. # 112 at 18.) Therefore, the Court—presuming that the parties are waiving their right to enforce Montana law—also applies Colorado law.

*Co. V Diodosio*, 841 P. 2d 1053, 1058 (Colo. 1992). The parties do not contest the existence of a contract or that damages resulted from the problems which arose during construction. (Doc. # 31-1; Doc. # 97-5 at 15; Doc. # 97-6 at 2, 5); *see also* (Doc. # 120-1 at 132–35.)

Structural argues that it is entitled to summary judgment on this claim because undisputed material facts demonstrate that "ASI was responsible for the initial 5 to 11 feet of 'missing' or unstressable post-tensioning tendons and resulting claimed damage"—which Structural argues is the only relevant damage at issue in this litigation. (Doc. # 91 at 22–23.) Structural's primary contention is that ASI, as the designer of the project, was responsible for ensuring the bulkheads remained in place—facilitating Structural's work which was dependent on the placement of those bulkheads. (*Id.* at 24–25.) Therefore, according to Structural, because the undisputed material facts establish that the bulkheads moved, only ASI can be found liable for the resulting damage. (*Id.*)

Concerning ASI's allegations that Structural's "design" was faulty, Structural argues that it was not a "designer" and had no design obligations under the contract. (Doc. # 91 at 25–26.) Rather, according to Structural, as the designer of record, ASI and Mr. Bjordahl "carry the responsibility for the design." (*Id.* at 26.)

As it specifically relates to the post-tensioning strands that were or were not installed, Structural argues that Plaintiff cannot meet its burden of proof to establish breach in this regard because neither ASI nor Structural kept records of installed strands. (Doc. # 97-9 at 12–14.) Rather, Structural argues that it "substantially performed" under the Subcontract—by installing all the tendons possible, but as a result

10

of ASI's failures those tendons were pulled up with the bulkheads and/or had their tails pulled out of the bulkheads, causing them to "drape." This resulted in an inability to install other tendons in the "shadow" of the drape. (Doc. # 97-23 at 9; Doc. # 120 at 36, 50–51); see also (Doc. # 97-5 at 9.)

Finally, Structural argues that even if it were to be found liable for the damage necessitating the installation of a liner, it should not be required to pay the full cost of the liner because the need "to install a much more robust and thicker/higher liner was due to the fact that ASI's pilasters rode up and extended past the as-designed elevation 136-feet, which was "due to the actions and inactions" of ASI. (Doc. # 91 at 23–24.)

Upon consideration of the Motion, the related briefing, and the applicable law, the Court finds that there are significant, genuine disputes of material fact that preclude summary judgment on ASI's breach of contract claim. The parties agree on the facts outlined in Section I above. However, ASI and Structural present different accounts of several facts which are essential to determining if one or both parties breached their obligations under the Subcontract. The Court must "view the evidence in the light most favorable to the non-moving party." *Allen*, 119 F.3d at 839. Moreover, the Court is "mindful that a ruling which deprives a party of a determination of the facts by a jury 'should be cautiously and sparingly granted.'" *Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 560 (10th Cir. 1996) (quoting *Cockrell v. Boise Cascade Corp.*, 781 F.2d 173, 177 (10th Cir. 1986)). The genuine disputes of material fact precluding summary judgment on ASI's breach of contract claim include but are not limited to:

- whether the collaboration that Structural engaged in surrounding the use of unbonded post-tensioning tendons and sliding bulkheads constitutes "design" work for which it can be held responsible under the Subcontract and/or which resulted in the bulkheads failing to remain at their designated elevation;

- whether the unbonded post-tensioning tendons Structural was to install in the silos pursuant to the Subcontract are proprietary;

- whether problems in the installation of post-tensioning tendons were the result of poor "design," poor planning, or the limited number and experience of Structural employees and laborers, or conversely if these problems originated with ASI's work, *compare* (Doc. # 97-1 at 2, –3, 10; Doc. # 97-4 at 2–8; Doc. # 97-7 at 2; Doc. # 97-8 at 2, 4; Doc. # 97-9 at 2; Doc. # 97-10 at 3–4, 6–7; Doc. # 97-11 at 2, 4; Doc. # 97-12 at 2–4; Doc. # 97-15 at 1; Doc. # 97-16 at 1) *with* (Doc. # 97-9 at 8–10; Doc. # 113 at 5, 13–14; Doc. # 120-1 at 144);

- the area of the silos in which the lack of stressable post-tensioning tendons resulted in the silos not meeting the design criteria for strength and/or "performance or serviceability" necessitating repairs, *compare* (Doc. # 97-5 at 15–16) *with* (Doc. # 120-1 at 131–35); and

- whether the height of the pilasters and/or missing or unstressable tendons above approximately the first ten feet into the post-tensioning area in the silos impacted the height of the repair liner. (Doc. # 97-5 at 14; Doc. # 97-15 at 1; Doc. # 120-1 at 183–90.)

Importantly, the parties present different accounts of what caused the bulkheads to "ride up" with the slipform and what impact this had on the as-constructed silos' failure to meet the specified design criteria. For example, the parties dispute:

- whether the reason no post-tensioning strands were placed from elevation 140 feet to 142 feet was because Structural was late, *compare* (Doc. # 97-1 at 3, 5, 8–9; Doc. # 97-2 at 8) *with* (Doc. # 113 at 12);

- what caused the first row of bulkheads to ride up, *compare* Doc. # 97-1 at 2, –3, 10; Doc. # 97-4 at 2–8; Doc. # 97-7 at 2; Doc. # 97-8 at 2, 4; Doc. # 97-9 at 2; Doc. # 97-10 at 3–4, 6–7; Doc. # 97-11 at 2, 4; Doc. # 97-12 at 2–4; Doc. # 97-15 at 1; Doc. # 97-16 at 1) *with* (Doc. # 120 at 46, 50); and

- what impact, if any, the issue with the first row of bulkheads had on subsequent tendon placement. *Compare* (Doc. # 120 at 39–40; Doc. # 120-1 at 206) *with* (Doc. # 120 at 36, 51.)

ASI also argues that "an issue of fact exists as to whether Structural waived the scope [sic] exclusion [relating to bulkheads] by voluntarily engaging in" the inspection and installation of bulkheads. (Doc. # 96 at 28–29.) Structural responds that any bulkhead work it engaged in does not constitute waiver because it occurred outside the "area at issue." (Doc. # 112 at 21.) However, as discussed above a genuine dispute of material fact exists as to the area of the silos which required repairs. *Compare* (Doc. # 97-5 at 15–16) *with* (Doc. # 120-1 at 131–35.)

Specifically, as it relates to Structural's claim that ASI cannot meet its burden to demonstrate Structural failed to install post-tensioning tendons, ASI has pointed to

13

testimony of at least three individuals who assert that they never saw tendon tails being pulled out of bulkheads, as well as the testimony of other individuals who disagree with Structural's drape theory. See (Doc. # 97-2 at 7; Doc. # 97-5 at 9–10; Doc. # 97-8 at 6; Doc. # 97-9 at 11; Doc. # 120 at 39.) The Court finds this to be sufficient "significantly probative evidence" to establish that a genuine dispute of material fact exists regarding Structural's theory for the missing or unstressable tendons. Jaramillo, 680 F.3d at 1269.

Because of these and other genuine disputes of material facts, the Court finds that Structural has not established that it is entitled to judgment as a matter of law on ASI's breach of contract claim. Fed. R. Civ. P. 56(a).

**B.     BREACH OF WARRANTY**

Structural also argues that the Court should grant summary judgment on ASI's second claim for relief, breach of express warranty. ASI's breach of warranty claim centers specifically around the "experience[] and skill[] in the construction of structures . . . of the type described" of Structural and its employees. (Doc. # 31 at ¶¶ 36–42; Doc. # 31-1 at 3.) ASI points out that the undisputed material facts demonstrate that although Structural's managers, engineers, superintendents, foremen and other in-house workers on the Project had varying levels of training, experience, and certifications in bonded post-tensioning work and/or slipform construction—no Structural employee had experience, training, or certifications specifically in unbonded post-tensioning work as installed in slipform construction. (Doc. # 97-8 at 2–4; Doc. # 97-12 at 2–4; Doc. # 97-18 at 2.)

14

However, neither party provided a definition of "experienced and skilled," or developed arguments regarding the specificity of such experience and skill required in the construction warranty context. In fact, neither party provided any case law specifying how the Court should interpret this contract language, or what constitutes a breach of an express warranty to provide "experienced and skilled" workers. In other words, although Structural argues that it is entitled to judgment as a matter of law, and although most, if not all the facts related to the qualifications and experience of Structural's employees appear undisputed, the Court is left with a dearth of law to which those facts should be applied. "[T]he substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. Without substantive law, the Court cannot make a determination on whether the undisputed facts are sufficient to entitle Structural to summary judgment on ASI's breach of warranty claim. As the moving party, it is Structural's burden to establish that it is entitled to judgment as a matter of law. *Bones*, 366 F.3d at 875. Therefore, the Court denies summary judgment on this claim.

C.   **PROFESSIONAL NEGLIGENCE & NEGLIGENT MISREPRESENTATION**

Finally, Structural seeks summary judgment on ASI's final two claims for relief, professional negligence, and negligent misrepresentation on the basis that these claims are barred by Colorado's economic loss rule.[5] (Doc. # 91 at 33–35.) The economic loss

---

[5] In its Motion, Structural also argued that summary judgment on ASI's professional negligence claim must be granted because ASI failed to file a Certificate of Review as required by Colo. Rev. Stat. 13-20-602(1)(a). (Doc. # 91 at 34–35.) However, ASI points out that it filed a Certificate of Review on October 17, 2019. (Doc. # 32.) Structural does not address this argument in its Reply (Doc. # 112), and the Court concludes that ASI sufficiently satisfied this requirement for the purposes of the instant Motion.

15

rule is broadly intended "to maintain a distinction between contract and tort law." *Town of Alma v. AZCO Const., Inc.*, 10 P.3d 1256, 1262 (Colo. 2000). As such, Colorado's economic loss rule provides that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Id.* at 1264. As the Colorado Supreme Court has explained, "[t]he essential difference between a tort obligation and a contract obligation is the source of the parties' duties. Contract obligations arise from promises the parties have made to each other, while tort obligations generally arise from duties imposed by law to protect citizens from risk of physical harm or damage to their personal property." *BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 72 (Colo. 2004) (internal citation omitted); *see also Town of Alma*, 10 P.3d at 1262 ("A breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie. A breach of a duty arising independently of any contract duties between the parties, however, may support a tort action.") Thus, the key inquiry in determining whether the economic loss rule bars a tort claim is "determining the source of the duty that forms the basis of the action." *Town of Alma*, 10 P.3d at 1264.

ASI avers that its professional negligence and negligent misrepresentation claims are permissible because they arise from pre-contractual conduct—specifically the "months of professional design work that Structural completed on the unbonded post-tensioning and the 'sliding' bulkhead[s]" prior to the signing of the Subcontract, and Mr. Harger's pre-contractual alleged representations that "Structural has much past prior

experience with unbonded post-tensioning on these types of projects (slipform silos)." (Doc. # 96 at 34.) This Court agrees that liability for pre-contractual work and statements are not barred by the economic loss rule.

As the Colorado Court of Appeals points out, "[t]he economic loss rule does not apply to claims arising from a defendant's pre-contractual conduct because, at that time, there was no contract that could have subsumed identical tort duties." *Dream Finders Homes LLC v. Weyerhaeuser NR Co.*, 506 P.3d 108, 120 (Colo. App. 2021) (citing *Van Rees v. Unleaded Software, Inc.*, 373 P.3d 603, 607 (Colo. 2016); *Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 291, 293 (Colo. App. 2009)). Further, the Tenth Circuit interpreting Colorado law, stated,

> Where a negligence claim is based only on breach of a contractual duty, the law of contract rightly does not punish the breaching party, but limits the breaching party's liability to damages that naturally flow from the breach. **It is an altogether different situation where it appears two parties have in good faith entered into a contract but, in actuality, one party has deliberately made material false representations of past or present fact, has intentionally failed to disclose a material past or present fact, or has negligently given false information with knowledge that the other party would act in reliance on that information in a business transaction with a third party. The breaching party in this latter situation also is a tortfeasor and may not utilize the law of contract to shield liability in tort for the party's deliberate or negligent misrepresentations**.

*United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1226–27 (10th Cir. 2000) (emphasis added). Applying this logic, this Court has previously found that "although fraud claims cannot proceed where they arise from duties implicated by the parties' contract," pre-contractual allegations of fraudulent inducement are not barred by the economic loss rule. *Xedar Corp. v. Rakestraw*, No. 12-cv-01907-CMA-BNB, 2013

17

WL 93196, at *5–6 (D. Colo. Jan. 8, 2013); *see also Town of Alma, Inc.*, 10 P.3d at 1263 n.10 (citing a Texas state court opinion noting that fraudulent inducement is based on an independent duty, thus precluding application of the economic loss rule). The same logic applies to allegations of pre-contractual professional negligence and negligent misrepresentation. *See Town of Alma*, 10 P.3d at 1263 (citing cases arising out of negligent misrepresentation in support of a recognition that certain common law tort claims expressly designed to remedy economic loss may exist independent of a breach of contract claim).

As discussed above, the parties do not dispute that, prior to the June 25, 2018 execution of the Subcontract, Structural engaged with ASI regarding how installation of the post-tensioning strands and sliding bulkheads would work, including the provision of concept drawings and engineering calculations. (Doc. # 97-5 at 20–21; Doc. # 97-20 at 1–8; Doc. # 97-25 at 2–13; Doc. # 113 at 17–18.) Therefore, to the extent that ASI seeks recovery for pre-contractual work for which Structural owed a duty to fulfill a professional standard of care, such recovery is not barred by the economic loss rule.

Anticipating this argument, Structural asserts that pursuant to the Subcontract's integration clause and the parol evidence rule, "any prior discussions, representation, or conduct is of no effect and merges into the Subcontract." (Doc. # 91 at 34 (citing *AT&T Corp. v. Gen. Steel Domestic Sales*, No. 04-cv-01334-EWN-MEH, 2006 WL 894903, at *4 (D. Colo. Mar. 30, 2006).) However, the parol evidence rule is inapplicable to the instant argument. "The parol evidence rule serves only to exclude evidence of prior or contemporaneous **agreements** designed to alter the terms of an unambiguous,

18

completely integrated contract." *Centennial-Aspen II Ltd. P'ship v. Aspen*, 852 F. Supp. 1486, 1493 (D. Colo. 1994) (citing *Tripp v. Cotter Corp.*, 701 P.2d 124, 126 (Colo. App. 1985)) (emphasis added). Structural provides no legal authority for its assertion that the parol evidence rule also bars the introduction of evidence related to pre-contractual **conduct**.

> Further, as the Supreme Court of Colorado has explained,
>
> claims of negligent misrepresentation are based not on principles of contractual obligation but on principles of duty and reasonable conduct. *Cosmopolitan Homes, Inc.* [*v. Weller*], 663 P.2d [1041,] 1043 [(Colo. 1983)]. The parol evidence rule does not bar the admission of evidence to establish tort claims not specifically prohibited by the terms of an agreement. *Agristor Leasing v. A.O. Smith Harvestore Prods., Inc.*, 869 F.2d 264 (6th Cir.1989) (general release of claims clause ineffective to bar claims of fraud and misrepresentation in the inducement). *See Formento v. Encanto Bus. Park*, 154 Ariz. 495, 744 P.2d 22 ([Colo.] App.1987).

*Keller v. A.O. Smith Harvestore Prods., Inc.*, 819 P.2d 69, 72 (Colo. 1991). The same logic applies to ASI's pre-contract professional negligence claim. As discussed above, both ASI's professional negligence and negligent misrepresentation claims, to be viable pursuant to the economic loss rule, cannot be—and in this case are not—premised on the existence of a written contract as ASI appropriately limits these claims to pre-contractual actions Structural engaged in. (Doc. # 31 at ¶¶ 43–54.) Therefore, the parol evidence rule does not prevent ASI from seeking recovery for damages allegedly caused by professional engineering and/or "design" work Structural engaged in prior to the execution of the contract.

## IV. CONCLUSION

For the foregoing reasons, Defendant/Counter Claimant Structural Technologies, LLC's Motion for Summary Judgment (Doc. # 91) is DENIED.

DATED: August 18, 2023

BY THE COURT:

CHRISTINE M. ARGUELLO
Senior United States District Judge